UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  03/26/2015
```

------------------------------------------------------------------X
                                            :

ALBERT OMAR YOUNG,
                                            :

                        Petitioner,         :         14-CV-9531 (JMF)

                                            :

             -v-                          :        OPINION AND ORDER

                                            :

OSCAR AVILES, et al.,
                                            :

                        Respondents.     :

                                            :
------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

       This case presents a question that remains unresolved by the United States Court of

Appeals for the Second Circuit and has divided the district courts in this Circuit: whether the

mandatory detention provision of the Immigration and Nationality Act ("INA"), 8 U.S.C.

§ 1226(c) ("Section 1226(c)"), applies where, as a here, an alien is convicted of an otherwise

qualifying offense but is not detained by the immigration authorities immediately upon his or her

release from criminal custody.  Petitioner Albert Omar Young petitions for the writ of *habeas*

*corpus*, pursuant to Title 28, United States Code, Section 2241, arguing that he is entitled —

either under the INA or as a matter of due process — to an individualized bail determination.

Siding with those courts that have held that Section 1226(c) applies without regard for whether

an alien is detained immediately upon his or her release from criminal custody, the Court

concludes that Young is not entitled to an individualized bail determination, at least not yet.

Accordingly, and for the reasons explained below, it denies Young's petition without prejudice

to a renewed petition if or when his detention becomes unreasonably prolonged.

## BACKGROUND

The relevant facts are largely undisputed and can be stated briefly.  Young is a citizen of Jamaica and permanent resident of the United States.  (Am. Verified Pet. (Docket No. 7) ("Pet.") ¶ 1).  In October 2013, while driving in Maryland, he was stopped and found to be in possession of approximately twenty pounds of marijuana.  (Pet. ¶ 2; Pet'r's Reply Resp't's Opp'n Writ Habeas Corpus (Docket No. 13) ("Petr'r's Ex."), Ex. D. at 28; Govt.'s Return (Docket No. 9) ("Govt.'s Ex."), Ex. B at 8-10).[1]  As a result of that conduct, he later pleaded guilty to possession with intent to distribute a controlled substance, a felony under Maryland law, and was sentenced to ninety days in jail, with credit for time served.  (Govt.'s Ex. B at 1-2, 5; Petr'r's Ex. D. at 26-27).  On April 26, 2014, Maryland released Young, but he did not remain at liberty for long.  On August 28, 2014, approximately four months after his release from Maryland custody, Young was once again taken into custody — this time by immigration officials who had initiated removal proceedings against him based on his conviction.  (Pet. ¶ 5; Govt. Ex. C).

Young remains in federal immigration custody, in New Jersey, having never received a bond hearing.  Invoking Section 1226(c), Respondents maintain that Young's Maryland conviction subjects him to mandatory detention for the duration of his immigration proceedings.  Young sought a change of custody status from an Immigration Judge ("IJ"), but the IJ rejected that request in December 2014.  (Govt.'s Exs. D, E).  He has apparently also filed applications for Cancellation of Removal and asylum, and immigration proceedings are ongoing.  (Pet'r's Mem. Law Supp. Pet. Writ Habeas Corpus (Docket No. 8) ("Pet'r's Mem.") 5; Petr'r's Ex. G

---

[1]     Although Petitioner styled Docket No. 13 as a "reply," his actual reply is found at Docket No. 12.  Docket No. 13 appears to contain the exhibits that Petitioner originally tried to file as part of his Amended Petition.  (*See* Docket No. 7 and associated error message).  Because Respondents have not objected, the Court will consider the exhibits filed at Docket No. 13.

(Docket No. 23)).  On December 2, 2014, while temporarily present in this District to attend a hearing in his immigration proceedings, Young filed the present petition.  (Docket No. 1).[2]

## DISCUSSION

Young seeks relief on two primary grounds.  First, he contends that because he was not taken into custody by the Department of Homeland Security ("DHS") immediately upon release from Maryland custody, he is not subject to mandatory detention under Section 1226(c), but is instead entitled to a bond hearing under Section 1226(a).  (Pet. ¶¶ 23-27; Pet'r's Mem. 7-17).  Second, he argues that his continued detention violates the Due Process Clause given both the gap between when he was released by Maryland officials and when he was detained by immigration officials and the total length of time that he has spent in DHS custody.  (Pet. ¶¶ 28-30; Pet'r's Mem. 17-20).  The Court begins with Young's statutory arguments before turning to his constitutional claims.

## A.    Mandatory Detention Pursuant to Section 1226(c)

When an alien is arrested and detained pending a decision on removal, DHS generally has the discretion to release him on bond.  *See* 8 U.S.C. § 1226(a).[3]  DHS has no discretion,

---

[2]    The Court suspects that Young filed his petition in this District as a way of bypassing the Third Circuit, which — as discussed below — has taken a position adverse to the one that Young argues here.  Young's forum shopping aside, there is no dispute that jurisdiction and venue are proper, as Young was present in this District at the time that the petition was actually filed.  *See, e.g.*, *Mendoza v. Muller*, No. 11-CV-7857 (RJS), 2012 WL 252188, at *2 (S.D.N.Y. Jan. 25, 2012) ("Although Petitioner is being held in New Jersey, jurisdiction is proper in this Court because he filed the petition while detained in New York in connection with his immigration proceedings.").  (*See* Resp't's Mem. Law Opp'n Pet. Writ Habeas Corpus (Docket No. 10) ("Resp't's Mem.") 3 n.2 (conceding that jurisdiction and venue are proper)).

[3]    Strictly speaking, Section 1226 grants authority to, and imposes duties on, "the Attorney General" rather than DHS.  Effective March 1, 2003, however, "the Immigration and Naturalization Service (INS), under the direction of the Attorney General, ceased to exist and its functions were transferred to" DHS.  *Vasquez v. Holder*, 602 F.3d 1003, 1006 n.3 (9th Cir. 2010) (citing Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 (Nov. 25, 2002)); *see also* See 6 U.S.C. §§ 202, 251, 557.  With that transfer of authority, "the title 'Attorney

however, to release aliens who have committed certain enumerated offenses.  *See id.* § 1226(c).

Instead, under Section 1226(c)(1), DHS "shall take into custody any alien who" has committed

certain offenses enumerated in Sections 1226(c)(1)(A) through (c)(1)(D) "when the alien is

released, without regard to whether the alien is released on parole, supervised release, or

probation, and without regard to whether the alien may be arrested or imprisoned again for the

same offense."  *Id.* § 1226(c)(1).  Section 1226(c)(2) does grant DHS authority to "release an

alien described in paragraph [c](1)," but only in certain limited circumstances related to the

protection of witnesses in criminal cases.  *Id.* §1226(c)(2).  The question here — which has long

divided courts nationwide — is whether the language in Section 1226(c)(1) requiring DHS to

take qualifying aliens into custody "when . . . released" means that an alien who, like Young, is

not detained by DHS immediately after his release from criminal custody, is subject to

mandatory detention pursuant to Section 1226(c) or entitled to an individualized bond hearing

pursuant to Section 1226(a).  *See Straker v. Jones*, 986 F. Supp. 2d 345, 352-53 (S.D.N.Y. 2013)

(citing many cases on both sides of the question).

Significantly, the Court does not confront that question on a blank slate.  Separate and

apart from the many courts that have weighed in on the question, the Board of Immigration

Appeals ("BIA") has held that the "when released" clause of Section 1226(c) "create[s] a pre-

condition for DHS to exercise its mandatory detention authority," and does not "set[] a deadline

for its use."  *Id.* at 352 (citing *In re Rojas*, 23 I & N Dec. 117 (BIA 2001)).  In *Rojas*, the BIA

concluded that the "when released" clause does in fact "direct [DHS] to take custody of aliens

immediately upon their release from criminal confinement."  23 I & N Dec. at 122.  But looking

---

General' [in Section 1226] is synonymous with the Secretary of Homeland Security."  *United States v. Rios-Zamora*, 153 F. App'x 517, 520-21 (10th Cir. 2005) (unpublished decision).

at the language of Section 1226(c)(2) (which allows DHS to release aliens "described in paragraph [(c)](1)"), and relying on the statute's text and context, the BIA concluded that the "when released" language merely "impose[s] a duty on [DHS] to assume the custody of certain criminal aliens and specifie[s] the point in time at which that duty arises."  *Id.* at 121 (citing *In re Noble*, 21 I & N. Dec. 672 (BIA 1997) (interpreting a nearly identical statutory provision)).  Further, that "duty to detain is not affected by the character of an alien's release from criminal incarceration or the possibility that an alien may be rearrested on criminal charges."  *Id.*  "In other words, the 'when released' clause is irrelevant for all other immigration purposes," including an alien's eligibility for a bond hearing.  *Id.* at 122.

It is well established that the BIA is entitled to deference under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837 (1984).  *See, e.g.*, *Negusie v. Holder*, 555 U.S. 511, 516-17 (2009); *Lanferman v. Bd. of Immigration Appeals*, 576 F.3d 84, 88 (2d Cir. 2009).  Thus, the relevant question is not how the Court, if it were writing on a blank slate, would interpret Section 1226(c).  Instead, the relevant question — at least in the first instance — is whether the statute is ambiguous.  More specifically, under *Chevron*, the Court must first ask "whether Congress has directly spoken to the precise question at issue.  If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  467 U.S. at 842-43.  If, however, "the statute is silent or ambiguous with respect to the specific issue," the Court proceeds to the second step of the *Chevron* analysis, asking "whether the agency's answer is based on a permissible construction of the statute."  *Id.* at 843.  A court may not defer to an interpretation that is "arbitrary, capricious, or manifestly contrary to the statute."  *Kar Onn Lee v. Holder*, 701 F.3d 931, 936 (2d Cir. 2012) (internal quotation marks omitted).  But "[i]f the agency interpretation is

reasonable, then [a court] must defer to it." *Id.* (internal quotation marks omitted). This framework "is rooted in a background presumption of congressional intent" and "provides a stable background rule against which Congress can legislate: Statutory ambiguities will be resolved, within the bounds of reasonable interpretation, not by the courts but by the administering agency." *City of Arlington v. FCC*, 133 S. Ct. 1863, 1868 (2013); *see Negusie*, 555 U.S. at 517 (stressing that "[j]udicial deference in the immigration context is of special importance").

Applying that analysis here, the Court agrees with Respondents that the BIA's interpretation is entitled to deference.[4]  As an initial matter, the Court concludes that Section 1226(c) is, at a minimum, ambiguous.  On the one hand, "'when' can include the characteristic of immediacy, referring in its primary conjunctive sense, to action or activity occurring at the time that or as soon as other action has ceased or begun." *Sulayao v. Shanahan*, No. 09-CV-7347 (PKC), 2009 WL 3003188, at *4 (S.D.N.Y. Sept. 15, 2009) (internal quotation marks omitted).  But "'[w]hen' can also mean 'at or during the time that.'" *Id.* (quoting Concise Oxford English Dictionary (11th ed. 2008)).  Or, as Judge Engelmayer recently explained, "it is also a

---

[4]      Young argues that the BIA's decision is not entitled to *Chevron* deference with respect to the issue posed here because the BIA was interpreting the meaning of "alien described in paragraph (1)" (in Section 1226(c)(2)), not the "when released" clause (in Section 1226(c)(1)). (Pet'r's Mem. 14-15 (citing *Baquera v. Longshore*, 948 F. Supp. 2d 1258, 1263 (D. Colo. 2013)). *See also Araujo-Cortes v. Shanahan*, 35 F. Supp. 3d 533, 544 & n.7 (S.D.N.Y. 2014) (declining to defer to *Rojas* on that basis).  But while the BIA's conclusion did hinge on its interpretation of the "alien described in paragraph (1)" clause, its interpretation was not limited to the meaning of that clause alone — it was instead interpreting Section 1226(c) as a whole.  The question before the Court is whether the BIA's interpretation is consistent with that provision, and nothing in *Chevron* suggests that a court reviewing an agency's interpretation of an ambiguous statute should parse it so finely.  *See De La Mota v. U.S. Dep't of Educ.*, 412 F.3d 71, 78 (2d Cir. 2005) (noting that *Chevron* "requires courts to defer to an agency's interpretation of an ambiguous statute unless the interpretation is arbitrary, capricious, or manifestly contrary to the statute" (internal quotation marks omitted)).  In any event, a focus on the "alien described in paragraph (1)" clause rather than the "when released" clause would not change the outcome here.

'reasonable ordinary usage' for the word 'when' to refer to a duty that, although arising 'at the time that,' continues forward.  For example, if a person lends a book to a friend and asks her to 'return the book when you finish reading it,' the borrowing friend's duty to return the book arises once she finishes reading the book.  It does not evaporate if she fails to promptly return it." *Straker*, 986 F. Supp. 2d at 354.  The two definitions of "when" lead, in turn, "to two different meanings of the phrase 'when the alien is released' . . . Applying the first meaning, the phrase 'when the alien is released' would mean 'at the time that the alien is released' . . . If the second definition is used, however, the phrase means 'at *or during* the time that the alien is released.'" *Sulayao*, 2009 WL 3003188, at *4 (emphasis added).

If anything, DHS's interpretation of the statute is more persuasive than the interpretation favored by Young.  Beginning with the text, Section 1226(c) "does not expressly put a time limit on DHS's mandatory detention authority," even though "[t]here were ready ways for Congress to set an outside deadline on agency action" — by, for example, giving "DHS a timetable to effect a mandatory detention after the alien's release" or stating "that DHS loses that authority if it delays to act."  *Straker*, 986 F. Supp. 2d at 353.  At bottom, as Judge Engelmayer explained in his well-reasoned opinion in *Straker*, the word "when" is both "an awkward, unfamiliar locution to use to set a time limit" and "unhelpfully imprecise as to what that time limit is."  *Id.*; *see also, e.g.*, *Sulayao*, 2009 WL 3003188, at *5-7.  "Unless read to mean that DHS's detention must commence instantaneously upon the alien's release from criminal custody, the deadline set by 'when' is nebulous.  Is DHS detention too late to qualify as mandatory detention under § 1226(c)(1) if it occurs 10 minutes after the alien's release from criminal custody?  An hour?  A day?  A week?"  *Straker*, 986 F. Supp. 2d at 353.  Finally, even if "when" were construed to mean "immediately," it would not follow that an alien who is not immediately taken into custody

would be entitled to an individualized bond hearing.  Concluding that "DHS's duty to take the criminal alien into detention ripens immediately upon release does not carry the corollary that this duty vaporizes immediately thereafter if unfulfilled."  *Id.* at 354-55; *see also Hosh v. Lucero*, 680 F.3d 375, 380 (4th Cir. 2012) ("[W]e conclude that it is far from plain, and indeed unlikely, that 'when . . . released' means 'at the moment of release, *and not later*.'").

In urging a different conclusion, Young contends — as several courts have concluded — that adopting DHS's interpretation would render the "when released" clause superfluous. (Pet'r's Mem. 11-12 (citing cases)).  But that is not the case.  First, as Judge Engelmayer's decision in *Straker* makes clear, adopting DHS's interpretation of the statute does not render the "when released" clause superfluous because "[t]he word 'released' is itself a word of limitation." *Straker*, 986 F. Supp. 2d at 355.  In *Straker* itself, for example, Judge Engelmayer deferred to the BIA's interpretation of Section 1226(c) in *Rojas*, and thus held that DHS's duty and authority to detain a criminal alien "when the alien is released" do "not terminate if DHS cannot, or does not, act expeditiously."  *Id.* at 356.  Nevertheless, Judge Engelmayer concluded that the petitioner *was* entitled to an individualized bond hearing because, having never been sentenced to or served a term of imprisonment, he was never "released" within the meaning of Section 1226(c).  *See id.* at 356-63.  Second, the "when released" clause does work in another respect: It makes plain that DHS's duty and authority to detain a criminal alien ripens only upon release from criminal custody — *and not before*.  *Cf.* 8 U.S.C. § 1228(a)(3) (prohibiting the "removal of any alien sentenced to actual incarceration, before release from the penitentiary or correctional institution where such alien is confined"); *id.* § 1231(a)(4)(A) (providing that, with certain exceptions, ICE "may not remove an alien who is sentenced to imprisonment until the alien is released from imprisonment").  In other words, the "when released" clause is far from superfluous.

The Court's conclusion that a gap between release from criminal custody and entry into immigration custody does not entitle an alien to an individualized bond hearing is reinforced by the purpose of Section 1226(c).  As explained by the Supreme Court in *Demore v. Kim*, 538 U.S. 510 (2003), Congress enacted the statute because it "had before it evidence that one of the major causes of the INS' failure to remove deportable criminal aliens was the agency's failure to detain those aliens during their deportation proceedings." *Id.* at 519.  For example, studies suggested that, once released on bond, more than twenty percent of deportable aliens who had been convicted of a crime failed to appear for their removal hearings. *See id.* at 519-20.  Although the Attorney General had the discretion to conduct individualized bond hearings and would theoretically release only those aliens who did not present a flight risk, "in practice the INS faced severe limitations on funding and detention space, which considerations affected its release determinations." *Id.* at 519.  Congress therefore "enacted the mandatory detention provision of § 1226(c) to address [these] high rates of pre-removal flight." *Debel v. Dubois*, No. 13-CV-6029 (LTS) (JLC), 2014 WL 1689042, at *4 (S.D.N.Y. Apr. 24, 2014).  Holding that mandatory detention applies even where detention is delayed furthers that purpose; holding otherwise would not. *See, e.g.*, *Guillaume v. Muller*, No. 11-CV-8819 (TPG), 2012 WL 383939, at *5 (S.D.N.Y. Feb. 7, 2012) ("Given this problem, it stands to reason that Congress would create a system of mandatory pre-removal detention that applies to more than those criminal aliens detained with a day or a few days of their release from criminal custody."); *Gomez v. Napolitano*, No. 11-CV-1350 (JSR), 2011 WL 2224768, at *3 (S.D.N.Y. May 31, 2011) ("Permitting certain individuals to avoid mandatory detention simply because ICE fails to immediately take them into immigration custody runs counter to this congressional intent."); *Diaz v. Muller*, No. 11-CV-4029 (SRC), 2011 WL 3422856, at *2 (D.N.J. Aug. 4, 2011) ("Indeed, given the purpose of the

statute, one does not see any particularly compelling argument that an alien who is not detained until a week or two after his release from custody has become less dangerous to society or poses less of a risk than one who is immediately transferred to federal custody.").

In response, Young asserts that "Congress enacted mandatory detention to prevent incarcerated immigrants from being released and evading removal proceedings for that offense, not to deny bond hearings to individuals who reintegrate into the community." (Pet'r's Mem. 12-13). Congress's primary goal was indeed to ensure that criminal aliens did not evade removal proceedings; as *Demore* makes clear, however, it chose to accomplish that goal by prohibiting DHS's consideration of individualized determinations such as ties to the community in deciding whether to detain certain kinds of aliens. *See Demore*, 538 U.S. at 520 (noting a study that "strongly supports Congress's concern that, even with individualized screening, releasing deportable criminal aliens on bond would lead to an unacceptable rate of flight"). Young also contends that DHS's reading of the statute would lead to "absurd results" because it would require the agency to detain an alien without bond "even if removal proceedings commenced as much as fifteen years after criminal custody terminated" and the alien had reintegrated into his or her community. (*Id.* at 13). But the fact that a statute "may be viewed as harsh or rigid does not make it absurd"; "[i]mmigration and deportation laws have long had features denounced as harsh." *Straker*, 986 F. Supp. 2d at 355. If anything, it is *Young's* interpretation of the statute that would lead to absurd — or at least unfair — results, as an alien who was detained a day, or even minutes, after his release from criminal custody would be entitled to more favorable treatment than an otherwise identically situated alien who was released directly into immigration custody. *See Rojas*, 23 I & N Dec. at 124 (reasoning that it would be "inconsistent" to interpret Section 1226(c) in a manner that "permits the release of some criminal aliens, yet mandates the

detention of others convicted of the same crimes, based on whether there is a delay between their release from criminal custody and their apprehension by [DHS]").

Finally, the Court's interpretation of Section 1226(c) is further reinforced by Supreme Court precedent. The Supreme Court has held that "a provision that the Government 'shall' act within a specified time, without more, [is not] a jurisdictional limit precluding action later." *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 158 (2003); *see United States v. Montalvo-Murillo*, 495 U.S. 711 (1990) (holding that the government may detain criminal defendants leading up to trial even if they do not comply with the relevant statute's command that a judicial officer "shall" hold a bond hearing "immediately upon the person's first appearance" before the officer); *see also Sylvain v. Attorney General of the U.S.*, 714 F.3d 150, 157-59 (3d Cir. 2013) (applying *Barnhart* and *Montalvo-Murillo* to Section 1226(c) in part because "[b]ureacratic inaction — whether the result of inertia, oversight or design — should not rob the public of statutory benefits"). Young attempts to distinguish this line of precedent by arguing that here, unlike in *Barnhart* and *Montalvo-Murillo*, "if [the government] provides Mr. Young a bond hearing, it does not lose authority but rather *gains* discretion to release him." (Pet'r's Reply Br. Supp. Pet. Writ Habeas Corpus (Docket No. 12) ("Pet'r's Reply") 9). That is arguably true, but, if anything, Young's argument cuts the other way. As discussed above, Congress passed Section 1226(c) because it believed the Attorney General had too much discretion to release aliens who had committed certain criminal offenses pending their removal hearings. It would be naïve at best to conclude that Congress intended to reward the government's failure to comply with one obligation by exempting it from another. *See Sylvain*, 714 F.3d at 160-61 ("Sylvain's interpretation would lead to an outcome contrary to the statute's design: a dangerous alien would be eligible for a hearing — which could lead to his release — merely because an official missed

11

the deadline.  This reintroduces discretion into the process and bestows a windfall upon dangerous criminals.").  The Court declines to do so here.

In short, the BIA's interpretation of Section 1226(c) is arguably correct, and certainly "based on a permissible construction of the statute."  *Chevron,* 467 U.S. at 843.  It follows that Young is subject to mandatory detention under the statute despite the fact that he was not detained by DHS immediately after his release from Maryland custody.  Moreover, contrary to Young's contentions (Pet'r's Mem. 13), neither the rule of lenity nor the canon of constitutional avoidance compels a different result.  Under the former, "lingering ambiguities in deportation statutes must be construed in favor of the alien."  *Ruiz-Almanzar v. Ridge*, 485 F.3d 193, 198 (2d Cir. 2007) (internal quotation marks omitted).  The rule, however, arguably applies only where an alien's deportability is ambiguous, and does not speak to whether an alien would be entitled to a bond hearing.  *See Hosh*, 680 F.3d at 383-84; *accord Debel*, 2014 WL 1689042, at *5.  And in any event, it "is a doctrine of last resort, and it cannot overcome a reasonable BIA interpretation entitled to *Chevron* deference."  *Mizrahi v. Gonzales*, 492 F.3d 156, 174-75 (2d Cir. 2007); *accord Johnson v. Orsino*, 942 F. Supp. 2d 396, 407 (S.D.N.Y. 2013).  As for the canon of constitutional avoidance, delay between when an alien is released from criminal custody and when he is detained by immigration officials does not present serious due process concerns for reasons discussed below.  And, although the total length of an alien's detention by immigration authorities can present such concerns, that issue has no bearing on the question of whether Section 1226(c) applies in the first instance to aliens who are not detained immediately upon release.  *See, e.g.*, *Reynoso v. Aviles*, No. 14-CV-9482, — F. Supp. 3d —, 2015 WL 500182, at *5-11, (S.D.N.Y. Feb. 5, 2015).  Accordingly, the Court holds that, as a statutory matter, Young is subject to mandatory detention pursuant to Section 1226(c).

**B.**     **Due Process**

The Court turns then to Young's constitutional claims.  There is no dispute "that the Fifth Amendment entitles aliens to due process of law in deportation proceedings."  *Demore*, 538 U.S. at 523.  Further, it is plain that "[i]ndefinite detention in connection with removal proceedings without an opportunity for a bail hearing, where there is no possibility of actual removal, violates the due process rights of the detained alien."  *Debel*, 2014 WL 1689042, at *5 (citing cases).  In *Demore*, however, the Supreme Court upheld Section 1226(c)'s mandatory detention provisions against a facial due process challenge.  *See* 538 U.S. at 531.  Thus, the question presented here is whether application of Section 1226(c) to Young violates the Due Process Clause.  Contending that it does, Young tries to distinguish his circumstances from those faced by the alien in *Demore* on three grounds: (1) based on the length of time between his release from criminal custody and his detention by immigration officials; (2) based on the assertion that he has a "substantial challenge" to removability; and (3) based on the length of time that he has been detained. (Pet'r's Mem. 18-20).  The Court will address each in turn.

**1.**     **The Gap Between Release and Detention**

Young's first claim — concerning the gap between his release from criminal custody and his detention by immigration officials — is without merit.  Young's argument is essentially that detention is constitutional only if it "bears a reasonable relation to the purpose[s] for which the individual was committed."  *Zadvydas v. Davis*, 533 U.S. 678, 690-91 (2001) (internal quotation marks omitted).  The Supreme Court has found that detention pending removal has two basic purposes: preventing flight before removal and avoiding danger to the community.  *Id.*  When an alien is released from incarceration for a period of time before he is detained, Young argues, DHS may not presume, without a hearing, that he is a flight risk.  (Pet'r's Mem. 19).  In so

arguing, Young depends heavily on the Supreme Court's decision in *Zadvydas* and Justice Kennedy's concurrence in *Demore*. (Pet'r's Mem. 18-19). Neither case, however, involved a gap between release from criminal custody and detention. Instead, they both examined whether the total length of an alien's detention implicates the Due Process Clause. *Demore*, 538 U.S. at 522-23, 531-32; *Zadvydas*, 533 U.S. at 689, 701; *see also Reynoso*, 2015 WL 500182, at *9 ("Justice Kennedy's concurrence [in *Demore*] did not address, let alone propose a due process test to govern, the separate issue presented by the duration of time taken by immigration authorities before apprehending a criminal alien after completion of his prison sentence."). Accordingly, neither case is particularly helpful to Young.[5]

In fact, Young's argument is directly contrary to the majority opinion in *Demore* — which Justice Kennedy joined in full. In that case, an alien who had conceded removability argued that Section 1226(c) was unconstitutional both facially and as applied because, in the absence of an individualized hearing, there was no reason to conclude that he was a flight risk. 538 U.S. at 514. The Court, however, concluded that no individualized hearing was necessary because "Congress had before it evidence suggesting that permitting discretionary release of aliens pending their removal hearings would lead to large numbers of deportable criminal aliens skipping their hearings and remaining at large in the United States unlawfully," and "[mandatory] detention necessarily serves the purpose of preventing deportable criminal aliens

---

[5]    Young's argument does find some support in case law, albeit not in *Zadvydas* and *Demore*. In *Castaneda v. Souza*, 769 F.3d 32 (1st Cir. 2014), the First Circuit held, based on its reading of Justice Kennedy's concurrence in *Demore* and the canon of constitutional avoidance, that aliens must be detained within a reasonable time after release from criminal custody. *Id.* at 38-39, 44, 46-48. Although that opinion has since been withdrawn, at least one Court in this Circuit has adopted similar reasoning. *See Rodriguez v. Shanahan*, No. 14-CV-9838, — F. Supp. 3d — , 2015 WL 405633, at  *12-14 (S.D.N.Y. Jan. 30, 2015). For the reasons explained in this Opinion and Order, the Court finds *Castaneda* and its progeny unpersuasive.

from fleeing prior to or during their removal proceedings." *Id.* at 528.  Nothing about the delay

between Young's release and his arrest by immigration officials changes that analysis, as nothing

distinguishes such delay from the various other circumstances that could decrease an alien's risk

of flight.  If an individualized hearing were necessary in Young's case, it would presumably also

be necessary any time an alien could point to some aspect of his or her life that makes flight

particularly unlikely.[6]  That is precisely the argument the Supreme Court rejected in *Demore*.

Thus, Young's contention that the delay between his release from criminal custody and his arrest

by immigration officials violates the Due Process Clause must fail.

### 2.    A Substantial Challenge to Removability

Young's second argument is also meritless.  The exact contours of Young's argument are

not entirely clear, but he appears to suggest that his detention violates the Due Process Clause

because, whereas the alien in *Demore* had conceded removability, he has a "substantial

challenge" to removability, making his ultimate removal unlikely.  (Pet'r's Mem. 19).  He also

cites several cases supposedly supporting that proposition.  *See, e.g.*, *Demore*, 538 U.S. at 531-32

(Kennedy, J., concurring) (stating that the ultimate purpose behind Section 1226(c) assumes the

alien's deportability, and suggesting that the Due Process Clause may be implicated when that

assumption does not hold true); *Tijani v. Willis*, 430 F.3d 1241, 1247 (9th Cir. 2005) (Tashima, J.

concurring) (stating that the mandatory detention statute should be interpreted as applying only

to aliens who could not raise a substantial challenge to their removability).  The Court need not

decide whether the detention of an alien who has a "substantial challenge" to removability raises

due process concerns, however, because Young has not demonstrated that he has such a

---

[6]      Young himself implicitly concedes the point, stating that he is also not a flight risk
because he has "spent years building local family" and has "strong equities and community ties."
(Pet'r's Mem. 19).

challenge.  Although Young does not specify in his memorandum of law what his "substantial

challenge" is (Pet'r's Mem. 19-20), the only possibilities presented in either his habeas petition

or his memorandum are his applications for cancellation of removal and for asylum.  (Pet. ¶ 3;

Pet'r's Mem. 5).  With respect to the latter, Young provides no detail, so it is impossible for the

Court to conclude that his asylum application represents a substantial challenge to removal.

With respect to the former, an application for cancellation of removal is not a challenge to

removability, but rather a request for discretionary relief.  *See, e.g.*, *De La Vega v. Gonzales*, 436

F.3d 141, 143-146 (2d Cir. 2006).  Unfortunately for Young, "the Supreme Court's decision in

*Demore* all but forecloses the argument that "the term 'is deportable,' as used in § 1226(c),

means anything other than an alien who *prima facie* qualifies for removal," regardless of

whatever forms of discretionary relief may be available, as well as the argument that applying

the mandatory detention statute to an alien who may qualify for discretionary relief is

unconstitutional.  *Gayle v. Johnson*, 4 F. Supp. 3d 692, 707 (D.N.J. 2014).  Indeed, the alien in

*Demore* itself had applied for discretionary relief — withholding of removal.  *See* 538 U.S. at

522 n.6.  Thus, there is no basis for the Court to conclude that Young has a substantial challenge

to removability that affects the due process analysis.

### 3.    *The Duration of Detention*

Young's last constitutional argument, that the duration of his detention without a bond

hearing violates the Due Process Clause, is his most substantial.  Young has been detained since

August 28, 2014 — that is, as of today, for almost seven months.  Relying heavily on the

Supreme Court's decisions in *Zadvydas* and *Demore*, Young contends that the Supreme Court set

a six-month limit on mandatory detention under Section 1226(c).  (Pet'r's Mem. 20).  That

reliance, however, is largely misplaced.  In *Zadvydas*, the Court found that a six-month detention

following a final order of removal was presumptively reasonable.  *Zadvydas*, 533 U.S. at 701.

But it did not hold that detention longer than six months is necessary unreasonable.  Instead, after

that time, detention becomes unreasonable *if* "there is no significant likelihood of removal in the

reasonably foreseeable future."  *Id.*  Additionally, in *Demore*, the Supreme Court explicitly

distinguished the circumstances in *Zadvydas* from those present in cases like this one.  Unlike in

*Zadvydas*, where the aliens challenging their detention "were ones for whom removal was no

longer practically attainable" and for whom a final removal order had already been entered,

*Demore*, 538 U.S. at 527 (internal quotation marks omitted), in cases like Young's, where

detention is pending removal proceedings, detention not only "necessarily serves the purpose of

preventing deportable criminal aliens from fleeing prior to or during their removal proceedings,"

but also has "a definite termination point," namely, the proceedings' completion.  *Id.* at 528-29.

Further, although the Court in *Demore* stated that most removal proceedings conclude within

five months and that the habeas petitioner in that case had been detained for six, nowhere did the

Court suggest that there was a six-month limit on mandatory detention.  *Id.* at 530.

That said, many courts, including several in this Circuit, have found that prolonged

detention without a hearing can present a constitutional problem.  *See, e.g.*, *Diop v.

ICE/Homeland Sec.*, 656 F.3d 221, 233-34 (3d Cir. 2011); *Ly v. Hansen*, 351 F.3d 263, 271-72

(6th Cir. 2003); *Araujo-Cortes v. Shanahan*, 35 F. Supp. 3d 533, 548-49 (S.D.N.Y. 2014); *see

also Guangzo Zheng v. Decker*, No. 14-CV-4663 (MHD), 2014 WL 7190993, at *7 (S.D.N.Y.

Dec. 12, 2014) (citing cases).[7]  They have based their holdings largely on Justice Kennedy's

_____

[7]      Some of these courts have based their conclusions on an interpretation of the mandatory
detention statute as containing an implicit upper limit in order to avoid due process concerns,
rather than on the Due Process Clause itself.  *See Araujo-Cortes*, 35 F. Supp. 3d at 548; *see also
Orsino*, 942 F. Supp. 2d at 408 (listing cases).  Young does not raise a statutory interpretation

concurrence in *Demore*.  Although Justice Kennedy joined the majority opinion upholding the constitutionality of the mandatory detention statute, he also warned in his concurrence that "a lawful permanent resident alien . . . could be entitled [under the Due Process Clause] to an individualized determination as to his risk of flight and dangerousness if the continued detention becomes unreasonable or unjustified."  538 U.S. at 532 (Kennedy, J., concurring).  He elaborated that, "[w]ere there to be an unreasonable delay by the INS in pursuing and completing deportation proceedings, it could become necessary then to inquire whether the detention is not to facilitate deportation, or to protect against risk of flight or dangerousness, but to incarcerate for other reasons."  *Id.* at 532-533 (Kennedy, J., concurring).  The majority opinion was not as explicit as Justice Kennedy's concurrence, but it too emphasized that mandatory detention did not offend the Constitution in part because it was generally of a "shorter duration" than the detention at issue in *Zadvydas* — on average, only a month and a half.  *Id.* at 528-29.  Thus, although the Supreme Court has not said so definitively — and the Second Circuit has yet to weigh in — this Court agrees with those that have found that, at some point, detention without a hearing offends the Due Process Clause.

Young's detention, however, has not yet reached that point.  First, although "the sheer length of the proceedings is not alone determinative of reasonableness," *Debel*, 2014 WL 1689042, at *5, courts in this Circuit have upheld detentions of significantly longer duration than Young's, *see, e.g.*, *id.* at *6 (eighteen months and "likely" to exceed two years); *Orsino*, 942 F. Supp. 2d at 408-11 (fifteen months); *Johnson v. Phillips*, No. 10-CV-480 (HBS), 2010 WL 6512350, at *6-7 (W.D.N.Y. Dec. 20, 2010) (seventeen months); *Andreenko v. Holder*, No. 09-

---

argument.  But whether based on the Due Process Clause or the canon of constitutional avoidance, the Court's analysis would be the same.

CV-8535 (CM) (JCF), 2010 WL 2900363, at *3-4 (S.D.N.Y. June 25, 2010) (thirteen months). *But see Gordon v. Shanahan*, No. 15-CV-261 (JGK), 2015 WL 1176706, at *4 (S.D.N.Y. Mar. 13, 2015) (holding that detention of approximately eight months violated due process); *Araujo-Cortes*, 35 F. Supp. 3d at 548 (same where detention was "for more than six months"). Second, in determining whether detention without a hearing remains reasonable, most courts look to a variety of additional factors, "such as which party bears responsibility for the prolonged detention, whether the continued duration of the detention is finite or near conclusion, and the interests served by continued detention," among others. *Orsino*, 942 F. Supp. 2d at 409; *see Debel*, 2014 WL 1689042, at *5 (stating that "the principal factor considered in constitutional review of detention pending removal proceedings is the degree to which the proceedings have been prolonged by unreasonable government action"); *see also Diop*, 656 F.3d at 233 ("This will necessarily be a fact-dependent inquiry that will vary depending on individual circumstances.").

   Although it is a close call, applying those factors here, the Court cannot say that Young's continued detention without a bond hearing has yet crossed the line into a due process violation. First and foremost, "[t]here is no evidence that the immigration authorities have unreasonably prolonged [Young's] removal proceedings and consequent detention." *Debel*, 2014 WL 1689042, at *6; *see also Demore*, 538 U.S. at 532-33 (Kennedy, J., concurring) (citing the lack of evidence of "an unreasonable delay by the [Government] in pursuing or completing deportation proceedings"); *cf. Ly*, 351 F.3d at 272 (noting that the petitioner's detention was lengthened due to "the INS . . . drag[ging] its heels indefinitely in making a decision"). Nor is there any "indication that [Young's] continued detention . . . will last indefinitely," or — as discussed above — that his ultimate removal is unlikely. *Orsino*, 942 F. Supp. 2d at 410; *accord Debel*, 2014 WL 1689042, at *6; *cf. Zadvydas*, 533 U.S. at 702 (holding that "an alien may be

held in confinement until it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future"); *Monestime v. Reilly*, 704 F. Supp. 2d 453, 458-59 (S.D.N.Y. 2010) (holding that continued detention violated due process where a moratorium on removals to Haiti in the aftermath of an earthquake rendered the petitioner's detention indefinite).  Accordingly, the Court concludes that Young's continued detention without a bond hearing does not yet violate the Due Process Clause.  Further, nothing in the current record suggests that it is likely to be prolonged unreasonably.  *See Debel*, 2014 WL 1689042, at *6 ("Delays attributable to normal consideration of an alien's appeal of adverse decisions do not render unreasonable the consequent delay of his ability to gain release into his home country."). Nevertheless, "[i]f, at some point in the future, there are factors involving the length of his detention [that] implicate constitutional concerns, the petitioner is entitled to file another habeas petition." *Andreenko*, 2010 WL 2900363, at *4 (citing cases).[8]

## CONCLUSION

Regrettably, until the Supreme Court or the Second Circuit address the questions presented in this case, similarly situated aliens in this Circuit will continue to be treated differently.  That is, given the split among district courts in the Circuit, whether an alien in Young's position will be granted a bond hearing will continue to turn on the district judge to whom a particular habeas petition is assigned.  The Court sincerely hopes that the Second Circuit steps into the fray soon.  But in the absence of binding precedent from the Supreme Court and

---

[8]        In his memorandum of law, Young argues that even if he is ineligible for bond, DHS "may release" him on parole "on the basis of 'urgent humanitarian reasons' or 'significant public benefit.'"  (Pet'r's Mem. 21 (quoting 8 C.F.R. § 212.5(b)).  That may be true, but Young gives no indication that he has applied for such parole and, in any event, this Court lacks jurisdiction to consider a challenge to discretionary decisions denying parole to aliens. *See, e.g.*, *Viknesrajah v. Koson*, No. 09-CV-6442 (CJS), 2011 WL 147901, at *2 (W.D.N.Y. Jan. 18, 2011) (citing 8 U.S.C. § 1252(a)(2)(B)(ii)).

the Circuit, this Court has no choice but to reach its own decision on the questions presented. For the reasons stated above, the Court sides with those courts that have held that an alien in Young's position is subject to mandatory detention under Section 1226(c) and that Young's detention without a bond hearing does not yet violate due process. Accordingly, his petition is DENIED without prejudice to refiling if or when his detention becomes unreasonably prolonged.

There is one final matter to address: Last month, Young's counsel of record, Maggy Duteau, moved to withdraw and sought a retaining lien on Petitioner's file. (Docket Nos. 14, 18). Through his new counsel, Paul Grotas, Young has indicated that he does not oppose Duteau's motion to withdraw. (Docket No. 29). Accordingly, and having found that Duteau has "satisfactory reasons for withdrawal or displacement," Local Civil R. 1.4 — and in light of the procedural posture of the case — Duteau's motion to withdraw is GRANTED.

Young does, however, challenge Duteau's request for a retaining lien and, through Grotas, has submitted receipts purportedly indicating that he and his wife paid Duteau in full. (Docket No. 29 at 1; *id.*, Ex. A). Without expressing any view as to the authenticity of those receipts — or as to whether the receipts even establish that Duteau was paid in full, as they appear to all have been issued before commencement of this case — the Court is of the view that further fact-finding may be necessary to determine if Duteau is entitled to a retaining lien and, if so, to fix the amount of the lien. Accordingly, by separate order to be issued today, the Court will refer this matter to Magistrate Judge Maas for the purposes of assessing Ms. Duteau's request for a retaining lien. *See Foster v. City of New York*, No. 96-CV-9271 (PKL), 2000 WL 145927, at *6 (S.D.N.Y. Feb. 7, 2000) (indicating that the Court would refer any motion for a retaining lien to a magistrate judge "for an evidentiary hearing and determination of the appropriateness of the requested liens"); *Fed. Deposit Ins. Corp. v. Kisosoh Realty Corp.*, No.

21

90-CV-7900 (PKL), 1992 WL 34146, at *2 (S.D.N.Y. Feb. 18, 1992) (referring the case to magistrate judge for the purposes of conducting a hearing on the attorney's motion for a retaining lien in light of a factual dispute regarding the fees assessed).

**The Clerk of Court is directed to terminate Docket No. 18, to enter judgment denying the petition, and to close the case**.  The Court, however, retains jurisdiction to adjudicate the dispute regarding Duteau's request for a retaining lien.  *See Chesley v. Union Carbide Corp.*, 927 F.2d 60, 65 (2d Cir. 1991) (noting the "general rule that ancillary jurisdiction to resolve fee disputes continues after the initial litigation is no longer before the court").

SO ORDERED.

Date:   March 26, 2015
      New York, New York

JESSE M. FURMAN
United States District Judge